**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WILLIAM BUCK (R-21689), | Case No.: 18-cv-04195 |
| Plaintiff, | Hon. Thomas Durkin |
| v. | |
| DEBBIE KNAUER, ET AL., | |
| Defendants. | |

**SECOND AMENDED COMPLAINT**

Plaintiff, William Buck ("Buck"), by and through his attorneys, and for his First Amended Complaint against defendants Debbie Knauer ("Knauer"), Debra Johnson ("Johnson"), Ghaliah Obaisi as executor for the estate of Dr. Saleh Obaisi ("Obaisi"), deceased, Randy Pfister ("Pfister"), Dr. Steven Newbold ("Newbold"), Andrea Rigsby ("Rigsby"), Doug Stephens ("Stephens"), Sandra Funk ("Funk"), Lidia Lewandoska ("Lewandowska"), Tina Tomaras ("Tomaras"), Tiffany Utke ("Utke"), Christina Witkowski ("Witkowski"), Major James Burzinski ("Burzinski"), and Wexford Health Sources, Inc. ("Wexford") (collectively "Defendants"), alleges and states as follows:

**NATURE OF THE ACTION**

1. This is an action by Buck, currently an inmate in the custody of the Pontiac Correctional Center ("Pontiac"), whose constitutional rights were violated by the Defendants' deliberate indifference toward his acute dental and oral health needs during his incarceration at Stateville Correctional Center ("Stateville") and Menard Correctional Center ("Menard").

2. Buck brings this action pursuant to Title 42 U.S.C. § 1983 to redress violations of the Eighth Amendment, applicable to the states by incorporation into the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.

1

3.	Buck seeks actual, consequential, compensatory and punitive damages, as well as attorneys' fees and court costs from Defendants.

## JURISDICTION AND VENUE

4.	Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because the matters in controversy arise under the Constitution and laws of the United States.

5.	Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events that give rise to Buck's claims took place within the Northern District of Illinois.

6.	This Court has authority pursuant to 42 U.S.C. § 1983 to award appropriate actual, consequential, compensatory and punitive damages, and has authority under 42 U.S.C. § 1988 to award attorneys' fees and costs to successful civil rights plaintiffs.

## PARTIES

7.	Buck (ID No. R-21689) is currently an inmate at Pontiac, who at times relevant to this lawsuit was an inmate at Stateville and Menard. He was originally incarcerated on or around June 4, 2003, and remains in custody to this day.

8.	Defendant Obaisi was at all times relevant to this lawsuit employed by Wexford. He was at all relevant times the medical director at Stateville. He had management and administrative responsibilities at Stateville, including Buck's medical treatment and care at Stateville. Obaisi died after the initial filing of this lawsuit. Accordingly, Buck sues Obaisi, deceased, through the executor of his estate, Ghaliah Obaisi.

9.	Defendant Knauer was at all relevant times the Administrative Review Board Member responsible for review and response to grievances submitted by offenders in the custody of IDOC, including Buck.

10. Defendant Johnson was at all times relevant to this lawsuit employed by Wexford. On information and belief, she was at all relevant times responsible for the handling and processing of referrals relating to medical care of offenders in the custody of IDOC, including Buck.

11. Defendant Pfister was at all times relevant to this lawsuit the warden of Stateville.

12. Defendant Newbold was at all relevant times a dentist at Menard Correctional Center ("Menard") responsible for the dental and oral healthcare of offenders in the custody of IDOC, including Buck.

13. Defendant Rigsby was at all relevant times employed by IDOC as a correctional officer and counselor at Stateville.

14. Defendant Funk was at all times relevant to this lawsuit employed by IDOC as a Deputy Director of Operations.

15. Defendant Lewandowska was at all times relevant to this lawsuit an employee of, or contractor for, Stateville, acting as a nurse licensed to practice in the state of Illinois. She has and had nursing responsibilities at Stateville, including the administration of medical care to prisoners.

16. Defendant Tomaras was at all times relevant to this lawsuit an employee of, or contractor for, Stateville, acting as a nurse licensed to practice in the state of Illinois. She has and had nursing responsibilities at Stateville, including the administration of medical care to prisoners.

17. Defendant Utke was at all times relevant to this lawsuit an employee of, or contractor for, Stateville, acting as a nurse licensed to practice in the state of Illinois. She has

and had nursing responsibilities at Stateville, including the administration of medical care to prisoners.

18. Defendant Witkowski was at all times relevant to this lawsuit an employee of, or contractor for, Stateville, acting as a nurse licensed to practice in the state of Illinois. She has and had nursing responsibilities at Stateville, including the administration of medical care to prisoners.

19. Defendant Burzinski was at all times relevant to this lawsuit employed by IDOC as a correctional officer.

20. Defendant Stephens was at all times relevant to this lawsuit employed by IDOC as a transfer coordinator. Stephens was responsible for review and administration of offender transfers between correctional facilities, including transfer of Buck.

21. Defendant Wexford is the healthcare provider exclusively contracted with the state of Illinois to provide medical and dental services to inmates in IDOC.

22. Upon information and good faith belief, other parties may be added at a later date.

## GENERAL ALLEGATIONS

### Defendants Remove Buck's Healthy Teeth Without His Consent

23. On or about September 8, 2016, Buck went to see Dr. Mitchell, a dentist at Stateville where he was confined at that time.

24. Dr. Mitchell observed a partial bony impaction of two of Buck's posterior molars or "wisdom teeth", tooth #17 and tooth #32 (hereinafter the "Impacted Teeth").

25. Both of the Impacted Teeth had decay on the crown that was starting to cause decay on the distal surface of two other healthy teeth, tooth #18 & tooth #31 (the "Healthy Teeth").

4

26. Dr. Mitchell examined Buck and determined that he needed to have the Impacted Teeth removed. She informed Buck that extraction of the Impacted Teeth was a serious medical procedure that could not be performed on prison grounds and that he would be referred to an oral surgeon off site.

27. Buck consented to the extraction of the Impacted Teeth and Dr. Mitchell issued a referral of Buck to an oral surgeon in Joliet, Illinois, for the extraction.

28. After Dr. Mitchell issued the referral, Wexford changed approval of service from extraction of only the Impacted Teeth to extraction of both the Impacted Teeth and the Healthy Teeth.

29. Johnson is listed as the contact person on Wexford's "Certification of Service" form approving extraction of the Healthy Teeth. On information and belief, Johnson was involved in effecting this change to the approval of service.

30. No one contacted or consulted with Dr. Mitchell before changing the service to include extraction of the Healthy Teeth.

31. No one obtained Buck's consent before changing the service to include extraction of the Healthy Teeth.

32. On or about September 20, 2016, Doctor Glen Scheive ("Dr. Scheive"), the off-site oral surgeon, without the consent of Plaintiff and contrary to Dr. Mitchell's referral, extracted the Healthy Teeth along with the Impacted Teeth.

33. The unnecessary extraction of the Healthy Teeth caused Buck to experience post-operative complications, additional procedures, infection, and excruciating pain, which Buck continued to experience for months whenever he attempted to talk, eat, or otherwise open his mouth.

34. On or about September 21, 2016, upon Buck's return to Stateville after surgery, Buck met with Dr. Mitchell. When Dr. Mitchell learned that Dr. Scheive had extracted the Healthy Teeth, she called Dr. Scheive's office to ask why anyone would remove the Healthy Teeth. She was told that the referral received by Dr. Scheive included removal of the Healthy Teeth. Dr. Mitchell advised Dr. Scheive's office that the referral was wrong at Dr. Scheive's end.

35. Dr. Mitchell also referred Buck for a prosthetic to replace some of Buck's missing teeth noting that a new prosthetic would now be needed for him to properly masticate (i.e., chew) his food.

## Defendants at Stateville Ignore Buck's Post-Operative Treatment Needs

36. Because of the post-operative complications and pain following the September 20, 2016 surgery, Plaintiff required extensive post-operative care.

37. Dr. Mitchell ordered a specific treatment plan to address his serious medical condition, which included heat packs, medication for pain, antibiotics to fight infections, and regular mouth cleaning and rinse to aid in his healing.

38. At different times, Defendants Lewandowska, Tomaras, Utke and Witkowski (the "Nurse Defendants") were charged with providing this care.

39. Despite Dr. Mitchell's orders, at various times, the Nurse Defendants refused or delayed giving Plaintiff his heat packs, medication for pain and infection, and/or would not provide Buck with the ordered cleaning and rinse solution.

40. The refusal and delay in Plaintiff's post-operative care prevented and delayed his post-operative healing, worsening his health and pain.

6

**Buck is Transferred Despite his Serious Medical Condition**

41. Plaintiff's post-operative complications were serious. He had a chronic dental infection, causing excruciating pain. His face and jaw became swollen to the point that he could barely talk and had difficulty eating.

42. On October 24, 2016, Dr. Mitchell found that Buck's mouth was still not healing properly and ordered that Buck be sent back to an oral surgeon for further treatment.

43. This follow up appointment with an oral surgeon, scheduled to take place on or about October 26, 2016, was critical to resolve Buck's chronic post-surgery infection and complications.

44. Notwithstanding his immediate need to see an oral surgeon, on October 26, 2016, Buck was transferred from Stateville to Menard.

45. Defendants Pfister and Rigsby were aware that Plaintiff had recently had a serious medical procedure and was having ongoing complications that required immediate care.

46. Despite Buck's ongoing need for medical attention, Defendants Pfister and Rigsby issued and permitted the transfer of Buck to Menard.

47. In fact, when Defendants Pfister and Rigsby first tried to move Buck, the transfer had been stopped because of Buck's serious medical condition.

48. Despite Buck's ongoing health issues, his immediate upcoming appointment with the oral surgeon and the previous transfer being stopped all relating to Plaintiff's same post-surgery medical condition, Defendants Pfister and Rigsby continued to cause Buck's transfer from Stateville to Menard.

49. On information and belief, either: (i) because the block that housed Buck was closing down, Dr. Obaisi lowered, or ignored Wexford standards for allowing the transfer of an

7

ill or injured prisoner, such as Buck; or (ii) Wexford put in place standards and policies allowing the transfer notwithstanding the detrimental effect it would have on adequate treatment.

50. On information and belief, other inmates housed in the same block as Buck also may have been transferred notwithstanding the need for immediate medical attention during the months of October through December of 2016 so the block could be closed.

51. Defendants Pfister, Rigsby, and Obaisi, all allowed Buck's transfer from Stateville to Menard on October 26, 2016, despite his serious need for immediate medical attention.

52. Buck's transfer from Stateville to Menard interfered with his required care, among other things, in that he could not keep his scheduled appointment with the oral surgeon, just days away, and continued to be in excruciating pain.

**Defendants Ignore Buck's Medical Needs During His Transfer to Menard**

53. Defendant Burzinski, who already had some familiarity with Buck's condition, interacted with Buck on the day of the transfer.

54. Buck specifically showed Burzinski his mouth and communicated to Burzinski that he needed his scheduled immediate medical attention from an oral surgeon rather than being put on the transfer bus.

55. Burzinski ignored Buck's condition, indicating that even if the rest of Buck's teeth fell out, Burzinski was not going to let him miss the transfer bus.

56. During Buck's transfer from Stateville to Menard, the motor vehicle transferring Buck made a stop in Pontiac. During that stop, Buck spoke with Defendant Funk and one other unknown person.

57. Buck communicated to Funk that he needed immediate medical attention and

tried to show Funk the condition of his mouth. Funk did not intervene to obtain needed medical treatment for Buck. Instead, Funk responded that she did not care about Buck's mouth and told him to get away from her.

58. Also during the stop in Pontiac, Buck communicated to one other person whose name is unknown that he needed immediate medical attention and tried to show that person the condition of his mouth. That person took Buck's name and identification number, but did not intervene to obtain needed medical treatment for Buck. Instead, that individual told Buck that he would not stop the transfer for anybody. On information and belief, this individual was Defendant Stephens.

59. Buck's serious condition would have been obvious to Burzinski, Funk, and the other individual, who could clearly see Buck's physical state.

60. Defendants' failure to intervene to provide immediate medical care to Buck on October 26, 2016, caused a delay in treatment requiring Buck to endure agonizing pain and discomfort.

**Defendants Denied Plaintiff Appropriate Medical Treatment at Menard**

61. Upon arrival at Menard, Buck could barely open his mouth.

62. As part of the standard intake process, Defendant Newbold examined Plaintiff the day after his arrival.

63. Newbold observed that Plaintiff was suffering from post-operative complications relating to his wisdom teeth extraction and ordered treatment and an x-ray of Plaintiff's mouth.

64. As noted above, Buck had been scheduled to see an oral surgeon to address his complications. Buck communicated this to Newbold and requested that he be seen by an oral surgeon, hoping that he could finally have relief.

9

65. Newbold denied Plaintiff's request to see an oral surgeon, telling Buck that "they don't do that in Menard."

66. The treatment ordered by Newbold was ineffective. In November 2016, it was discontinued. However, Buck's condition and pain continued.

67. After more than a month of experiencing excruciating physical pain whenever he spoke, ate, or otherwise opened his mouth, Buck became despondent that he would never receive the medical care necessary to end his suffering. On October 28, 2016, Plaintiff attempted to take his own life.

68. Although there had been no improvement in Plaintiff's condition, on November 21, 2016, Defendant Newbold reduced and later stopped Plaintiff's treatment altogether. Buck was never allowed to see the oral surgeon or to obtain appropriate care. Buck also was never provided the prosthetic requested by Dr. Mitchell.

**Plaintiff's Grievance Falls on Deaf Ears Causing Irreparable Harm**

69. Over the following months, Plaintiff's mouth remained painful, swollen, infected, and prone to bleeding.

70. During this time, Buck repeatedly requested treatment for his condition, but treatment was not provided.

71. On December 12, 2016, Plaintiff filed a grievance complaining that, despite his serious medical condition and continued pain, he was receiving little to no treatment.

72. As a member of IDOC's administrative review board, Defendant Knauer has the power to investigate grievance claims, such as Plaintiff's, and to intervene when grievances involve medical treatment that should be provided.

73. Instead of intervening on behalf of Plaintiff, Knauer waited four (4) months to

respond to the grievance and took no action regarding Plaintiff's serious medical condition.

74. On information and belief, not only did Defendant Knauer fail to intervene, but she also did not investigate as to why Plaintiff wasn't getting necessary medical treatment.

75. On information and belief, in response to Buck's legitimate grievance, Defendant Knauer ignored Plaintiff's request for medical treatment. Her ultimate response deemed the grievance an administrative issue relating to Plaintiff's transfer from Stateville to Menard.

76. On or about June 16, 2017, after being transferred from Menard to Pontiac, Plaintiff was finally seen by another dentist.

77. The dentist at Pontiac immediately ordered that an oral surgeon examine Plaintiff.

78. This oral surgeon observed that the lump and pain Buck continues to experience in his mouth is related to his September 20, 2016 oral surgery and that, had someone intervened sooner could have been addressed.

79. It is now likely Plaintiff will have this condition for the rest of his life.

80. It is unknown whether the lump and pain in Plaintiff's jaw will ever improve.

## COUNT I
## INDIFFERENT CHANGE IN MEDICAL DIRECTION TO
## REMOVE HEALTHY TEETH WITHOUT CONSENT
(Against Wexford and Johnson, in her Individual and Official Capacity)

81. Buck repeats and re-alleges the allegations contained in paragraphs 1 through 80 as if fully restated here.

82. Defendants Wexford and Johnson were aware that Plaintiff had a serious medical condition.

83. Defendants were further aware that Buck required the removal of the Impacted Teeth.

84. Defendants Wexford and Johnson acted with deliberate indifference to the needs

11

of Plaintiff by, among other things, (a) effecting a change to the referral and Certification of Service to approve extraction of the Healthy Teeth when Plaintiff did not need those teeth removed; (b) failing to contact or consult with Dr. Mitchell before changing the service to include extraction of the Healthy Teeth; and (c) failing to obtain Buck's consent before changing the service to include extraction of the Healthy Teeth.

85. As a trained medical administrative professional trusted to transmit accurate information for the care of patients, Johnson was aware of the importance of submitting precise and truthful orders from physicians and other treatment providers, yet Johnson failed to accurately transmit Dr. Mitchell's referral for the extraction of the Impacted Teeth, thereby causing the unnecessary extraction of the Healthy Teeth and contributing to Buck's serious post-operative complications.

86. The Defendants' deliberate indifference deprived Buck of his right to be free from cruel and unusual punishment as secured to him under the Eight and Fourteenth Amendments to the United States Constitution, and has resulted in actual harm in the form of lost healthy teeth, severe and excruciating pain upon eating, speaking, or opening his mouth for weeks, with the site of the operation remaining infected, swollen, painful and bleeding.

WHEREFORE, Plaintiff William Buck, respectfully requests that this Court:

A. Declare the conduct of Defendants to have violated the rights guaranteed to Buck under appropriate Federal Law;

B. Order Defendants to make whole Buck by providing the affirmative relief necessary to mitigate the remaining effects of Defendants' unlawful practices;

C. Grant Buck actual, consequential, compensatory, punitive and any other damages that the Court may deem appropriate against Defendants;

D. Award Buck his costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

E.  Enter such other appropriate relief as this Court deems necessary and just.

## COUNT II
## INDIFFERENCE TO APPROPRIATE POST-OPERATIVE MEDICAL TREATMENT
(Against Defendants Wexford, and Obaisi, Pfister, Newbold, Rigsby, Stephens, Funk, Lewandowska, Tomaras, Utke, Witkowski, Knauer, and Burzinski in their Individual and Official Capacities)

87. Buck repeats and re-alleges the allegations contained in paragraphs 1 through 84 as if fully restated here.

88. Beginning on or before September 20, 2016, Buck had an objectively, sufficiently serious medical condition, namely impacted molars, which required oral surgery and ongoing medical care and treatment, including strict adherence to post-operative care.

89. Since Buck's surgery, Defendants have been on notice of Buck's serious medical condition related to his oral-surgery.

90. Defendants had a duty to provide all prisoners, including Buck, with adequate medical treatment for serious medical conditions.

91. Defendants were each aware of Buck's serious medical condition, but acted with a sufficiently culpable state of mind, in that they each knew Buck faced a substantial risk of harm and disregarded that risk.

92. As a result of Defendants' conduct, the state of Buck's post-operative oral health has declined, including infected, painful, and bleeding gums. Buck continued to suffer severe pain and discomfort when eating, speaking, or otherwise opening his mouth. He now suffers from a permanent painful lump at the surgical site.

93. As a licensed physician and Medical Director for IDOC, Obaisi was aware of the risks associated with Buck's serious medical condition, yet disregarded those risks by failing to ensure that Buck received the prescribed and appropriate care while incarcerated within an

Illinois correctional institution.

94. As a member of the Administrative Review Board responsible for the review and response to grievances submitted by offenders in the custody of IDOC, as a result of Buck's grievances, Knauer was aware of Buck's serious medical condition and the grave impact it had on his health and well-being, yet Knauer failed to conduct a proper investigation into Buck's grievances, his medical history, or medical treatment.

95. As a licensed dentist, Newbold was aware of the risks associated with Buck's serious medical condition, yet disregarded those risks by failing to ensure that Buck received the prescribed and appropriate care while incarcerated within an Illinois correctional institution.

96. As a correctional officer and counselor tasked with facilitating the care of offenders in the custody of IDOC who regularly interacted with Buck, Rigsby was aware of Buck's serious medical condition and the grave impact it had on his health and well-being, yet Rigsby failed to intervene and ensure Buck received medical care.

97. As Warden of Stateville at all relevant times, Pfister was to ensure inmates, including Buck, received proper medical and dental care; however either directly or through the establishment of, or acquiescence to, policies forbidding or interfering with such care, Pfister did not ensure Buck received necessary medical care.

98. As registered nurse, Lewandowska was aware of the risks associated with Buck's serious medical condition, yet disregarded those risks by failing to ensure that Buck received the prescribed and appropriate care while incarcerated within an Illinois correctional institution.

99. As registered nurse, Tomaras was aware of the risks associated with Buck's serious medical condition, yet disregarded those risks by failing to ensure that Buck received the prescribed and appropriate care while incarcerated within an Illinois correctional institution.

100. As registered nurse, Utke was aware of the risks associated with Buck's serious medical condition, yet disregarded those risks by failing to ensure that Buck received the prescribed and appropriate care while incarcerated within an Illinois correctional institution.

101. As registered nurse, Witkowski was aware of the risks associated with Buck's serious medical condition, yet disregarded those risks by failing to ensure that Buck received the prescribed and appropriate care while incarcerated within an Illinois correctional institution.

102. As a correctional officer tasked with facilitating the care of offenders in the custody of IDOC who regularly interacted with Buck, Burzinski was aware of Buck's serious medical condition, and the grave impact it had on his health and well-being, yet Burzinski failed to intervene and ensure Buck received medical care.

103. As a transfer coordinator for IDOC, Stephens had access to IDOC's internal systems wherein, as part of his oversight into Buck's transfer, he had access to Buck's medical history, holds, and any other documented information pertaining to Buck, yet despite Stephens' access to, and awareness of, Buck's documented medical issues, Buck's upcoming appointment with the oral surgeon, and the serious medical condition Buck presented with when he, on information and belief, interacted with Stephens, Stephens did not intervene to ensure Buck received medical care.

104. As Deputy Director for IDOC, Funk had access to IDOC's internal systems wherein, as part of her oversight of the operation of correctional centers, she had access to Buck's medical history, holds, and any other documented information pertaining to Buck, yet despite Funk's access to, and awareness of, Buck's documented medical issues, Buck's upcoming appointment with the oral surgeon, and the serious medical condition Buck presented with when he interacted with Funk, Funk did not intervene to ensure Buck received medical care.

105. Each Defendant, through the above described conduct and despite possessing the knowledge regarding Buck's medical condition post-surgery, delayed or denied him access to adequate medical care and knowingly disregarded excessive risks to Plaintiff's health and well-being by, among other things: (a) delaying, denying, preventing, or refusing to provide appropriate post-operative medical care; (b) delaying, denying, preventing, or refusing to provide appropriate and prescribed or observably necessary post-operative procedures; (c) initiating, allowing and effecting a transfer from Stateville to Menard; (d) delaying, denying, preventing, or refusing to provide post-operative care by an oral surgeon; (e) delaying, denying, preventing, or refusing a recommended post-operative prosthetic; and (f) recklessly failing to conduct the proper medical inquiries into Buck's complaints and to treat the inquiries with the appropriate care.

106. On information and belief, some of the above-described actions may have been taken by individual Defendants in contravention of the policies and procedures in place at Wexford, Stateville, and/or Menard and contrary to sound medical care for treating and managing Plaintiff's medical condition.

107. On information and belief, some of the above-described actions may have been taken by Defendants specifically pursuant to policies and procedures in place at Wexford, Stateville, and/or Menard that are maintained in a manner contrary to sound medical care for treating and managing Plaintiff's medical condition.

108. Defendants' ongoing deliberate indifference has deprived Buck of his right to be free from cruel and unusual punishment as secured to him under the Eight and Fourteenth Amendments to the United States Constitution, and has resulted in actual harm in the form of

severe and excruciating pain upon eating, speaking, or opening his mouth for weeks, with the site of the operation remaining infected, swollen, painful and bleeding.

WHEREFORE, Plaintiff William Buck, respectfully requests that this Court:

A. Declare the conduct of Defendants to have violated the rights guaranteed to Buck under appropriate Federal Law;

B. Order Defendants to make whole Buck by providing the affirmative relief necessary to eradicate the effects of Defendants' unlawful practices;

C. Grant Buck actual, consequential, compensatory, punitive and any other damages that the Court may deem appropriate against Defendants;

D. Award Buck his costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

E. Enter such other appropriate relief.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Buck demands trial by jury for all of the issues pled so triable.

Dated: May 28, 2019

Respectfully submitted,

**WILLIAM BUCK**

By:    /s/John S. Monical

**LAWRENCE KAMIN, LLC**
John S. Monical
300 S. Wacker Drive, Suite 500
Chicago, IL 60606
Telephone: (312) 372-1947
Facsimile: (312) 372-2389
Email: jmonical@lawrencekaminlaw.com

*Attorney for Plaintiff*