IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WILLIAM BUCK, | |
| Plaintiff, | |
| v. | Case No. 18-cv-4195 |
| DEBBIE KNAUER, ET AL, | Judge Mary M. Rowland |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff William Buck ("Buck"), is an inmate currently incarcerated at Pontiac Correctional Center. He has brought suit pursuant to 42 U.S.C. § 1983 against fourteen Defendants: Debbie Knauer, Debra Connors-Johnson ("Connors-Johnson"), Ghaliah Obaisi as executor for the estate of Dr. Saleh Obaisi, deceased, Randy Pfister, Dr. Steven Newbold ("Dr. Newbold"), Andrea Rigsby, Doug Stephens, Sandra Funk, Lidia Lewandoska, Tina Tomaras, Tiffany Utke, Christina Witkowski, Major Bryzenski, and Wexford Health Sources, Inc. ("Wexford," together "Defendants"). Buck alleges that Defendants acted with deliberate indifference towards a serious medical condition in violation of the Eighth Amendment while he was incarcerated at Stateville Correctional Center ("Stateville") and Menard Correctional Center ("Menard"). Relevant to the current motion, Buck alleges that Wexford and Connors-Johnson allowed the removal of two of his healthy teeth against medical advice and without his consent while he was incarcerated at Stateville (Count I), and that Dr. Newbold failed to provide adequate post-operative dental care after he was

1

transferred to Menard (Count II). Defendants Connors-Johnson, Dr. Newbold, and Wexford ("Moving Defendants") request summary judgment asserting Buck failed to exhaust his administrative remedies. (Dkt. 105). For the reasons stated below, the Moving Defendants' motion for summary judgment is granted in part and denied in part.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation and quotation marks omitted). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (citations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (*citing Anderson*, 477 U.S. at 255). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and

2

opposition to the motion for summary judgment." *White*, 829 F.3d at 841 (citations omitted).

## BACKGROUND

The Court considers the facts in the light most favorable to Buck, the non-moving party.[1] In 2016 Buck was incarcerated at Stateville. (Dkt. 124, ¶ 1). Wexford had a contract with the state of Illinois to provide medical services at various prisons, including Stateville. (Dkt. 124, ¶ 3). On September 8, 2016, Buck was seen by Dr. Mitchell, a dentist at Stateville. (Dkt. 124, ¶ 9). Dr. Mitchell determined that Buck had two impacted wisdom teeth, which needed to be extracted. *Id*. Dr. Mitchell also noted that the decay on those two teeth was beginning to spread to the surfaces of two adjacent teeth. *Id*. Buck was referred to Joliet Oral Surgery by Dr. Mitchell for the extraction. *Id*. That extraction surgery took place on September 20, 2016, but four teeth were removed, not two. (Dkt. 124, ¶ 11). Buck did not consent to the removal of the two teeth that were not impacted, and it does not appear the procedure was medically necessary in Dr. Mitchell's professional opinion. (Dkt. 124, ¶ 9).

Sometime after Buck's appointment with Dr. Mitchell but before his surgery, Connors-Johnson, the Medical Records Director at Stateville between 2016 and 2018, completed a referral approval form for that surgery. Contrary to the doctor's

---

[1] Facts from the parties' Local Rule 56.1 Statements of Uncontested Material Fact are cited by their docket number, accompanied by a paragraph number, exhibit number, or page number. Defendants' L.R. 56.1 Statement of Undisputed Material Facts is at Dkt. 106; Plaintiff's Response to the Defendants' L.R. 56.1 Statement is at Dkt. 124; Plaintiff's L.R. 56.1 Statement of Additional Facts is at Dkt. 124; and Defendants' Response to the Plaintiff's L.R. 56.1 Statement of Additional Facts is at Dkt. 133.

3

recommendation, the approval form indicated that four teeth, rather than two, should be extracted. (Dkt. 124, ¶ 10).

After surgery Buck experienced serious and persistent complications, including infection, swelling, and pain. (Dkt. 124, ¶ 20). Buck complained to Dr. Mitchell and requested medical treatment from various Stateville nurses. (Dkt. 124, ¶ 20). His final follow-up appointment with Dr. Mitchell took place on October 24, 2016, when according to Buck he was referred to the oral surgeon for additional treatment. *Id*. Dr. Mitchell also placed a medical hold on Buck meant to prevent his being transferred to another facility. (Dkt. 124, ¶ 20). Despite his medical needs and the medical hold, two days later on October 26, 2016 Buck was transferred from Stateville to Menard. (Dkt. 124, ¶ 13). He never received follow-up care from an oral surgeon. (Dkt. 133, ¶ 7).

Dr. Newbold, the third Moving Defendant, was employed by Wexford as a dentist at Menard at this time. (Dkt. 124, ¶ 4). He initially treated Buck for his ongoing complications by ordering x-rays and prescribing medication, but refused to send Buck to a specialist. (Dkt. 124, ¶¶ 14, 20). He stopped providing Buck with treatment after about one week. *Id*.

On October 27, 2016, immediately after his transfer to Menard, Buck tied a bed sheet around his neck and was placed on suicide-watch.[2] (Dkt. 133, ¶ 8). Buck has a history of mental health issues that includes periodic but severe cognitive

---

[2] The parties disagree about whether this was a "suicidal gesture" or a bona fide suicide attempt. Viewing the facts in the light most favorable to Buck, the Court assumes for purposes of this motion that it was a suicide attempt.

4

impairment, as well as repeated suicide attempts. (Dkt. 133, ¶¶ 2, 3). Over the next few weeks Buck's condition fluctuated. He was unresponsive to his medical providers for days at a time and often refused his medications, but occasionally he responded when nurses called his name. (Dkt. 133, ¶ 8). Buck was taken off of suicide watch on December 7, 2016. (Dkt. 133, ¶ 11).

The next day, December 8, 2016, Buck sent a grievance regarding his dental care directly to the Illinois Department of Corrections' Administrative Review Board ("ARB").[3] (Dkt. 124, ¶ 17). This grievance was received on December 12th and answered four months later on April 19, 2017. (Dkt. 124, ¶¶ 18, 21). In its response, the ARB declined to address Buck's transfer because "[t]ransfers are an administrative decision." (Dkt. 124, ¶ 21). The ARB further instructed Buck to provide a copy of his counselor's response to the grievance if applicable, as well as the Warden's response. (Dkt. 124, ¶ 21). Buck did not respond to the ARB. *Id*. He filed the present Complaint on June 15, 2018. (Dkt. 124, ¶ 6).

## ANALYSIS

The Moving Defendants argue that Buck failed to exhaust his administrative remedies. They first argue that Buck's grievance was untimely with respect to the allegations in Count I against Wexford and Connors-Johnson. Since the grievance was filed more than 60 days after that surgery, and Conners-Johnson was not

---

[3] In summary, his grievance complained that: on September 21, 2016 he wrongly had four teeth removed rather than two teeth; Johnson "falsely" changed the order to remove four teeth; his mouth became infected; he was denied medical treatment for the infection; he was transferred from Stateville to Menard despite a medical hold; and he was denied treatment when he arrived in Menard. (Dkt. 124, ¶ 20).

5

involved in any conduct post-surgery, they ask the Court to grant summary judgment on Count I. Moving Defendants next the argue that Buck's grievance was insufficient with respect to Wexford because it didn't allege a corporate policy in Count I. Finally, the Moving Defendants argue that Buck failed to exhaust his administrative remedies when grieving both Dr. Newbold's and Wexford's post-operative treatment at Menard (as alleged in Count II), because he sent his grievance directly to the ARB rather than the Menard administration.

The Prison Litigation Reform Act ("PLRA") requires that an inmate filing suit pursuant to § 1983 first exhaust available administrative remedies. *See* 42 U.S.C. § 1997e(a). In order to exhaust his remedies, an inmate must "file a timely grievance utilizing the procedures and rules of the state's prison grievance process." *Maddox v. Love*, 655 F.3d 709, 720 (7th Cir. 2011). That grievance process is laid out in the Illinois Administrative Code. Grievances are intended to "[allow prisons] to address complaints about the program it administers before being subjected to suit, [reduce] litigation to the extent complaints are satisfactorily resolved, and [improve] litigation that does occur by leading to the preparation of a useful record." *Id.* at 721 (citation omitted). Exhaustion of administrative remedies "is an affirmative defense," so the Moving Defendants bear the burden of proof. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

**I. Count I: Timeliness of Grievance**

Connors-Johnson and Wexford argue they are entitled to summary judgment with respect to Count I, which alleges the nonconsensual and unnecessary extraction

6

of two teeth. Any conduct attributable to Connors-Johnson or her employer, Wexford, at Stateville prison took place prior to Buck's extraction surgery on September 20, 2016. Because this was more than 60 days before Buck filed his grievance on December 8, 2016, Defendants argue that this grievance was not timely. *See* 20 Ill. Admin. Code. § 504.810(a).

Assuming without deciding that Buck was required to file a grievance and that his 60 days began to run on September 20, 2016,[4] the Court finds that any untimeliness is excused by his mental health condition, suicide attempt, lack of responsiveness, and restrictive living conditions while on suicide watch. After his suicide attempt Buck was kept in a cell that contained only a smock and a suicide blanket. (Dkt. 106, Ex. D, 21–28). He testified in his deposition that he was hearing voices and "out of his mind." (Dkt. 106, Ex. D, 132). He often failed to take his medications because he could not eat due to the pain he was experiencing. *Id*. at 136. Given these circumstances, the Court finds the grievance process was not available to Buck.[5] *See Weiss v. Barribeau*, 853 F.3d 873, 874–75 (7th Cir. 2017) (administrative remedies were not available to an inmate who was "grappling with a serious mental

---

[4] Buck argues he was not required to file a grievance because his teeth could not be replaced, and therefore no remedy was available. *See White v. Bukowski*, 800 F.3d 392, 394–96 (7th Cir. 2015) (inmate not required to file grievance about lack of prenatal care for her unborn child after its birth because "if one has no remedy, one has no duty to exhaust remedies"); *Vela v. Indiana Dep't of Corrs.*, No. 16-CV-51, 2018 WL 992664, at *4 (N.D. Ind. Feb. 20, 2018) (inmate not required to grieve flawed medical treatment because "by the time the plaintiff had reason to be concerned about the care he was receiving, permanent damage had occurred"); *Adams v. Wexford Health Sources, Inc.*, No. 15-CV-604-NJR-DGW, 2018 WL 4680728, at *7 (S.D. Ill. Sept. 28, 2018) ("grievance would have been 'merely academic and could not provide a remedy' as the damage to [inmate's] urethra, ureters, and kidneys was already done and no grievance could undo it"). While these cases are distinguishable, the Court declines to address this argument.

[5] The Court need not address Buck's argument that his filing was excusable for "good cause." Ill. Admin. Code § 504.810(a) (2003).

illness during the time he was supposed to be exhausting his administrative remedies"). If administrative remedies are not available to an inmate like Buck, then that inmate is not required to exhaust them. *See Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016) (administrative remedies not available to inmate while he was hospitalized because he was shackled and not provided with a handbook describing grievance procedures). In *Adams v. Wexford Health Sources, Inc.*, No. 15-CV-604, 2018 WL 4680728, at *3 (S.D. Ill. Sept. 28, 2018), the court determined that the "remedy is not 'available' within the meaning of the PLRA" to a mentally ill inmate who was unable to access the grievance procedure because he was confined to the facility's healthcare unit and did not have the "mental or physical wherewithal to understand and articulate all of the problems with his medical treatment in a grievance, let alone to follow the grievance process to completion". The same is true here.

Furthermore, courts have found that the grievance procedure was not available even when it was unavailable for only part of the filing period, provided the inmate did not know at the outset that the administrative remedy will become unavailable. *See Kendrick v. Limburg*, No. 17-CV-3000, 2019 WL 1330382, at *6 (S.D. Ind. Mar. 25, 2019) (administrative remedies unavailable to inmate who was in administrative lock-down for the last six days of a seven-day grievance filing period) (citing *White v. Bukowski*, 800 F.3d 392, 396 (7th Cir. 2015) (administrative remedies unavailable to inmate who did not file a grievance in the first eleven days after she was denied care, because the prison did not have a grievance filing deadline and she

8

was not told that she would be transferred to another facility before she could file her grievance)).

The grievance procedure was unavailable to Buck for 25 days, nearly half of his 60-day filing period, through no fault of his own. He did not realize at the beginning of the filing period that he would become mentally and physically incapacitated. He promptly filed a grievance just one day after his suicide watch was lifted. Therefore, the Court finds that he has exhausted his administrative remedies with respect to Count I.

## II. Count I: Wexford's Policies

The Defendants next argue both that Buck's *grievance* does not describe a policy attributable to Wexford, only the conduct of a Wexford employee, and that Count I of Buck's *Complaint* does not describe such a policy. The Court considers only the exhaustion argument and looks to the grievance.[6]

It is well-settled that an inmate does not need to name Wexford in order to exhaust administrative remedies against it. *See Nicholl v. Wexford Health Care Sources, Inc.*, No. 16-CV-50151, 2019 WL 4894566, at *2 (N.D. Ill. Oct. 4, 2019) (grievances that "do not specifically mention Wexford and do not detail problems with its policies or practices" nevertheless satisfy exhaustion requirement because they "put administrators on notice of the alleged problem with a fair opportunity to respond"); *Orozco v. Wexford Health Sources, Inc.*, No. 16-CV-995, 2018 WL 306923,

---

[6] The argument that "no policy is implicated in Count I of Plaintiff's Second Amended Complaint" might have been raised in a motion to dismiss (it is too late for that) and might be raised in a motion for summary judgment (if appropriate), but not during briefing on exhaustion.

at *4 (S.D. Ill. Jan. 5, 2018) (finding that Plaintiff who did not name Wexford in his grievance exhausted administrative remedies against Wexford because "[w]here the plaintiff is claiming a broad denial of proper treatment by the health care unit as a whole, he will not be found at fault for failing to name Wexford itself."); *Williams v. Carter*, 2012 WL 4815476, at *2 (N.D. Ill. 2012) (denying motion to dismiss "on the grounds of non-exhaustion" despite "plaintiff's failure to expressly name Wexford in his grievances").

Wexford attempts to distinguish these cases because Buck's grievance, as relayed in Count I, alleges Johnson "allegedly alter[ed] a form, a singular even which is administrative—not medical in nature." (Dkt. 134 at 11). Wexford relies on *Nally v. Obaisi*. No. 17-CV-2902, 2019 WL 6527953, at *3 (N.D. Ill. Dec. 4, 2019), in which the court found that the grievance "did not alert prison officials to a particular policy problem or invite them to take corrective action." However, the grievance in that case contained the non-sequitur that the plaintiff had "expressed [his] injuries to Dr. Davis and received medical care for [the] injuries; *change in policies/procedures treatment for an injury to [his] knee*, as well as an injection and a pill to help manage the pain." (emphasis added). *Id*. Unlike the plaintiff in *Nally*, Buck's grievance put the authorities on notice that medical recommendations were allegedly being overwritten by administrative personnel. This raises concerns about Wexford's policies and practices. Whether Buck can establish this was a wide-spread practice is a matter for another day, but he did not fail to exhaust the available administrative procedures.

10

Buck properly exhausted his administrative remedies before bringing Count I against Wexford, and summary judgment as to Count I is denied.

### III. Count II: Grievance Procedure

Finally, the Moving Defendants argue that Wexford and Dr. Newbold are entitled to summary judgment on Count II because Buck filed the grievance regarding his medical treatment at Menard with the wrong authorities, failing to exhaust his administrative remedies. In order to exhaust his administrative remedies, Buck was required to file his grievance in the manner prescribed by the prison administration and the Illinois Administrative Code. *Maddox v. Love*, 655 F.3d 709, 720 (7th Cir. 2011). Ordinarily, grievances about the facility where an inmate resides must first be filed with a prison counselor, then passed along to the Warden. 20 Ill. Admin. Code § 504.810(a) (2003) (inmates "shall first attempt to resolve incidents, problems, or complaints other than complaints concerning disciplinary proceedings through his or her counselor" though inmates "may request a grievance be handled on an emergency basis by forwarding the grievance directly to [the warden]"). Only after the Warden has responded to a grievance pertaining to his or her facility can it be appealed to the ARB. *Id.* at § 504.850. However, inmates "shall submit grievances directly to the Administrative Review Board when grieving [. . .] [o]ther issues except personal property issues that pertain to a facility other than the facility where the offender is currently assigned." *Id.* at § 504.870(a)(4).[7]

---

[7] The parties agree that the governing statute was enacted in 2003. 20 Ill. Admin. Code § 504.870(a)(4) (2003). The current version of that statute provides that the ARB is the first to review grievances about "[o]ther issues that pertain to a facility other than the facility where the offender is currently assigned,

11

While incarcerated at Menard, Buck filed one grievance describing the extraction that took place while he was at Stateville, the denial of post-operative care at Stateville, and the denial of care at Menard. Rather than deliver that grievance to his counselor at Menard, Buck mailed it directly to the ARB. (Dkt 133, ¶ 14). The question, then, is whether Buck was required to file one grievance with Menard and a separate grievance with the ARB, or was permitted to file a single grievance with the ARB.[8]

Neither party has presented the Court with judicial decisions interpreting the Illinois Administrative Code under these circumstances, so this Court looks to the text of that statute. Both § 504.810(a) and § 504.870(a) prescribe mandatory procedures. The first says inmates "shall" file grievances with their counselors, and the second says inmates "shall" file grievances pertaining to other facilities directly to the ARB. Indeed, Buck aptly points out that courts have faulted inmates for *failing* to grieve directly to the ARB when their grievance concerned a facility other than the one where they were housed. *See, e.g., Lang Vo Tran v. Ill. Dep't of Corrs.*, No. 9-CV-302, 2011 WL 816630, at *7 (S.D. Ill. Mar. 1, 2011) (finding plaintiff failed to exhaust his administrative remedies because he brought a grievance about his treatment at a previous facility to counselors at his current facility not to the ARB).

---

excluding personal property *and medical issues*." Ill. Admin. Code 20, § 504.870 (2017) (emphasis added).

[8] Dr. Newbold and Wexford do not dispute that Buck properly grieved his treatment at Stateville (contained in Counts I and II) directly to the ARB since he was housed at Menard at the time.

12

The Court finds that the mandatory language contained in § 504.810(a) and §504.870(a) required Buck to submit two separate grievances, one to the ARB raising issues that took place at Stateville and during the transfer between Stateville and Menard, and a second grievance to the Menard prison administration describing the denial of post-operative care and the failure to reschedule his missed follow-up appointment.

The Court acknowledges this presents a challenge to Mr. Buck, who suffers from mental and physical ailments. But "[s]ubstantial compliance with the rules is not enough." *Salley v. Parker*, No. 18-CV-5700, 2020 WL 4736412, at *8 (N.D. Ill. Aug. 14, 2020) (citing *Lewis v. Washington*, 300 F.3d 829, 833–34 (7th Cir. 2002)). And Buck's circumstances are a case-study demonstrating the importance of a strict exhaustion requirement. Neither Buck's counselors at Menard nor the facility's Warden were formally alerted to the fact that Dr. Newbold and Wexford were allegedly denying him post-operative care. Had they been alerted through the grievance process, they would have had the opportunity to ensure Buck got the care he needed. Furthermore, Buck testified that he was very familiar with the grievance process and had filed numerous grievances with counselors in the past. (Dkt. 133, ¶ 14).

Plaintiff argues Buck was required to submit his grievance to the ARB because the "key issue raised by the grievance" involved the "resolution of conflicting medical judgments from doctors at two different facilities." (Dkt. 123, 10). Plaintiff cites no authority for this proposition, and the Court does not regard conflicting medical

13

opinions as the key issue in his grievance. Rather, Buck complained of inadequate care and the ongoing denial of care.

Plaintiff also argues he was not required to do more to exhaust his remedies because the ARB responded by requesting that he "provide a copy of [his] [. . .] counselor's response, if applicable [and the] Chief Administrative Officer's response." (Dkt. 106, Ex. B). Those documents did not exist because Buck had not filed the grievance at Menard and had not received a response from his counselor or the Warden. Buck relies on *Salley v. Parker*, No. 18-CV-5700, 2020 WL 4736412, at *12 (N.D. Ill. Aug. 14, 2020), in which the ARB responded to a grievance about an issue that took place at another facility by asking the grievant to provide a non-existent response from his counselor, but did not explain what to do if that document did not exist. The *Salley* court determined in those circumstances the inmate had exhausted his administrative remedies. However, in *Salley* the inmate reached an administrative dead-end after *properly* filing a grievance about a different facility directly with the ARB. As to his complaints regarding Menard, Buck reached an administrative dead-end because he *improperly* filed a grievance directly with the ARB. Had he filed a grievance with the Menard administration, he would have had the documents the ARB requested. This is not a situation in which the grievance procedure was so opaque as to be unavailable. *See Reid v. Balota*, 962 F.3d 325, 330–31 (7th Cir. 2020) (grievance process was unavailable where ARB denied an appeal for lack of documentation but did not indicate that inmate should resubmit with documentation). Buck failed to exhaust his claims against Dr. Newbold.

## CONCLUSION

For the stated reasons, Defendants' motion for summary judgment (Dkt. 105) is granted in part and denied in part. The Court denies summary judgment as to Count I. The Court grants summary judgment to Dr. Newbold. Dr. Newbold is dismissed from the suit with prejudice. The Court also grants Wexford summary judgment as to Count II, limited to the allegations in Count II pertaining to Menard and Dr. Newbold's conduct. This decision does not impact the remaining defendants in Count II or the remaining claims against Wexford contained in Count II. (Dkt. 58 at ¶ 107).

E N T E R:

Dated: March 2, 2021

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge